UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| ROLAND B. SMITH and DEE ANNA SMITH, | ) ) ) |  |
| Plaintiffs, | ) ) | CV 00-J-1397-S |
| vs. | ) |  |
| COMPUTER SCIENCES CORPORATION, | ) ) ) |  |
| Defendant. | ) ) ) |  |

### MEMORANDUM OPINION

This cause comes before the court on stipulation of both parties that this case be submitted for final disposition. After careful consideration of the briefs and evidentiary materials submitted, this court finds, for the reasons set forth herein, that Computer Sciences Corporation ("CSC") is obligated under the terms of the Asset Purchase Agreement to continue to provide the plaintiffs Roland B. Smith and Dee Anna Smith with access to health care insurance through CSC, and to continue doing so at a level comparable to that made available to the plaintiffs through Computer Services Corporation ("Computer Services") at the time of the execution of the Agreement between plaintiffs and Nichols Research Corporation ("NRC").

I. Facts

Roland B. Smith was the founder and sole shareholder of Computer Services Corporation.



In 1995, NRC approached plaintiff Smith about purchasing the assets of Computer Services. Affidavit of Roland B. Smith § 2. Several proposals of the Asset Purchase Agreement were drafted subsequently. *Id.* at § 3. The first three drafts did not address the issue of continued health insurance coverage for plaintiff Smith and his wife Dee Anna Smith. Smith then became concerned about continued coverage for himself and his wife after the sale. As a result, Smith informed the then president of NRC, Chris Horgen, that, as a condition to Smith's agreement to sell the assets of his company, NRC would have to make health care coverage available to the plaintiffs after the closing. Horgen stated that this would not be a problem. Affidavit of Smith at § 3. NRC agreed to assume Computer Services' Blue Cross Blue Shield plan, and Computer Services amended its health insurance plan to state as follows:

> **Active Employees**
>
> Any CEO who is no longer a full time active employee will be able to continue coverage under the current group plan until you are eligible for Medicare or reach age 65, which ever comes first.

*Id.* § 4, and Exhibit A to Affidavit of Smith.

In addition, on June 16, 1995, John Wynn, NRC's attorney, forwarded a new draft of the Agreement to Jack Stephenson, counsel for Smith and Computer Services, which for the first time included a provision for continued health insurance coverage for the plaintiffs. Specifically, newly added Section 1.4 stated as follows:

> 1.4   Employee Benefits. Schedule 1.4 sets forth the employee benefit plans maintained by Seller which Purchaser will continue for its employees after the Closing. The parties acknowledge that such benefit plans may be amended or terminated by Purchaser after Closing, except that Purchaser shall at all times while Shareholder is an employee of Purchaser make available to Shareholder, at Shareholder's cost, through a health insurance plan, participation in a health maintenance organization or other similar

2

> arrangement, a program which will cover the medical expenses of Shareholder and his spouse at a level comparable to coverage provided Shareholder and his spouse under Blue Cross, Blue shield Health Insurance Plan presently maintained by Seller.

Exhibit D to Affidavit of Jack P. Stephenson.

This provision specifically limited the extension of coverage to the plaintiffs to the period of time that Smith was an employee of NRC pursuant to his employment agreement. This language was later removed. Affidavit of Stephenson § 6. In a cover letter conveying this draft of the Agreement to Stephenson, John Wynn stated that it may be desirable to include this provision in his Employment Agreement rather than the Asset Purchase Agreement. Exhibit E to Affidavit of Stephenson.

Upon reviewing this draft, Stephenson circled the language limiting coverage to the period of Smith's employment and additionally, in typewritten notes on that draft, Stephenson specifically questioned whether health insurance should be conditioned upon Smith's employment with NRC. In further discussing the insurance coverage, the parties decided to include the language in the employment agreement, and as a result, Wynn prepared a draft of such an employment agreement, which had a period of five years. Upon review of it, Stephenson wrote the equation "$57+5=62$" on the draft, indicating his concern that Smith would only be age 62 at the expiration of the agreement, thereby leaving him ineligible for Medicare for a period of three years. Exhibit G to Affidavit of Stephenson.

The parties subsequently agreed to remove the health insurance provision from the employment agreement and keep it in the Asset Purchase Agreement. This draft of the Agreement became the final version of the Agreement, and the final Section 1.4 reads as follows:

>1.4   Employee Benefits. Schedule 1.4 sets forth the employee benefit plans maintained by Seller which Purchaser will continue and assume for its employees after Closing. The parties acknowledge that such benefit plans may be amended or terminated by Purchaser after Closing. Purchaser shall make available to Shareholder, at Shareholder's cost, through health insurance plan, participation in a health maintenance organization or other similar arrangement, a program which will cover the medical expense of Shareholder and his spouse at a level comparable to the coverage provided Shareholder and his spouse under the Blue Cross and Blue Shield of Alabama insurance plan maintained by Seller immediately before Closing.

The final version of Section 16(c) states as follows:

>16.   Post-Closing Covenants. After the closing, NRC and Purchaser covenant as follows:
>(c) The employee health insurance plan and other employee benefits identified on Schedule 1.4 will be continued by Purchaser, subject to the right of Purchaser to amend or terminate such plan except as otherwise provided as to Shareholder's health insurance benefit provided under Section 1.4.

The agreement also contains a section entitled <u>Survival of Representation, Warranties, and Covenants; Indemnification</u> which states as follows:

>14.1   Survival. The representation, warranties and covenants made by Seller, Shareholder, Purchaser and NRC in this agreement will survive the Closing Date and any investigation or inquiry made by either party for a period of four years from the Closing Date.

Exhibit B to Affidavit of Smith.

The parties executed the Agreement effective June 30, 1995, and NRC began making health care coverage available to the plaintiffs pursuant to the Agreement. Affidavit of Smith § 5. NRC assumed the Blue Cross/Blue Shield plan of Computer Services, which provided coverage for the plaintiffs until they became eligible for Medicare or age 65, whichever occurred first. NRC continued to make that coverage available to the plaintiffs up until November 1999, more than four years after execution of the Agreement. At that time, NRC and CSC entered into an agreement

whereby NRC was merged into CSC and became a wholly owned subsidiary of CSC. *Id.*

The Smiths continued to receive health care coverage until April, 2000. On April 3, 2000, the Director of Human Resources for CSC sent a letter to Smith informing him that CSC had terminated the health care coverage for the Smiths, and that continued coverage would be available only through COBRA, which last for only eighteen months. Exhibit C to Affidavit of Smith.

## II. Analysis

The face of Asset Purchase Agreement requires CSC to continue to provide the Smiths with access to health insurance coverage and conveys an intent to make health insurance available to the Smiths through NRC with no true limitation. Contrary to CSC's's argument that Section 14.1 of the Agreement limits health insurance access to a period of four years, the court finds that Section 14.1 applies only to representations, warranties and covenants made in anticipation of the closing of the transaction, such as to operate the business in the ordinary course of business until the closing and not to sell or encumber assets before closing (obligations found in Sections 6 and 7). Section 14.1 ensures that these obligations, which typically merge into the contract, would survive the closing for a period of four years in order to allow the parties sufficient time to seek indemnification for any loss suffered as a result of a breach of any of these representations, warranties and covenants. Although the term "covenants" is used in Section 14.1 and NRC's obligation to provide insurance access is technically a covenant, the inclusion of Section 16(c) clearly negates any effort to apply Section 14.1 to the issue of insurance coverage. The covenant made in Section 1.4 is not triggered until closing so it is, by its nature, a post-closing. Survival of this covenant is not an issue as this covenant is operative only after the closing. Section 16, entitled "Post-Closing Covenants," specifically and properly addresses the issue of insurance coverage. By doing so, it is clear that the

drafters of the contract intended for Section 16 to govern the issue of insurance access rather than 14.1, as CSC would have the court believe. The face of the contract is clear and conclusively expresses the intent for the plaintiffs to have access to insurance coverage beyond the alleged four year cut-off.

Assuming *arguendo* that the contract is found to be ambiguous, the admission of parole evidence, permitted under Alabama law, equally supports this court's finding that CSC is required to provide the plaintiffs access to health insurance coverage. Under Alabama law, if a written agreement is ambiguous, parol evidence is admissible to clarify its terms. *Anderson Brothers Chrysler Plymouth Dodge, Inc. v. Hadley*, 720 So. 2d 895, 897 (Ala. 1998). The Supreme Court has repeatedly relied upon the parol evidence rule to interpret ambiguous contracts. *Lackey v. Central Bank of the South*, 710 So.2d 419 (Ala. 1998) (holding that "parol evidence, including evidence of the way in which the parties to the contract interpreted the language of that form, will be admissible to determine its meaning"); *Hartford Acc. & Ind. Co. v. Morgan County Association of Volunteer Firefighters*, 454 So. 2d 960, 961 (Ala. 1984) (holding that once the court has decided that the contract is ambiguous, the determination of the true meaning of the contract is a question for the fact finder and that the surrounding circumstances, including the construction placed on the language by the parties, are taken into consideration); *See also Dees v. Dees*, 581 So.2d 1103 (Ala. Civ. App. 1990) (holding that actions of parties after execution of the contract evidence their interpretation of the contract).

In the case before the court, not only does the evidence surrounding the negotiation and execution of the Agreement indicate that the parties did not intend to limit the coverage to four years, the actions of the parties post-closing confirm this intent. First, the fact that the parties removed the

coverage beyond the five year length of the employment agreement, or at the very least that the parties did not want the plaintiffs' coverage to be limited by the employment agreement. In addition, NRC's adoption of the Computer Services Blue Cross Plan, which included a provision allowing coverage for the Smiths beyond four years, shows a contemplation that the Smiths would have coverage beyond the alleged four year cut-off. The actions after the execution of the Agreement are equally as supportive as both NRC and CSC allowed coverage over and beyond four years.

## III. Conclusion

For the foregoing reasons, this Court finds that, under the terms of the Asset Purchase Agreement executed on June 30, 1995, the plaintiffs Roland D. Smith and Dee Anna Smith, are entitled to obtain health insurance coverage through CSC's health insurance program without limitation, time or otherwise. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** this _8_ day of August, 2000.

Inge P. Johnson
United States District Judge